**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**BETTY LOU WALKER,**

       **Plaintiff,**

**v.**                           **Case No.: 3:10-cv-01409**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

       **Defendant.**

**MEMORANDUM OPINION**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 13, 14 and 15).  Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 7 and 8).

The Court has fully considered the evidence and the arguments of counsel.  For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

I.    **Procedural History**

Plaintiff, Betty Lou Walker  (hereinafter "Claimant"), filed applications for DIB and SSI on November 20, 2006, alleging that she became disabled on January 26, 2006 due to "low back and shoulder problems and uterine mass." (Tr. at 114-16, 119-21, and 132). The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 10). Thereafter, Claimant requested an administrative hearing, which was conducted on October 6, 2008 by the Honorable Michelle Cavadi, Administrative Law Judge (hereinafter "ALJ").  (Tr. at 20-51). By decision dated July 16, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-19).  The ALJ's decision became the final decision of the Commissioner on October 28, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).  Claimant filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 10, 11, 13, 14, and 15). Consequently, the matter is ripe for resolution.

II.   **Claimant's Background**

Claimant was forty-five years old at the time of her administrative hearing. (Tr. at 25).  She attended school through the seventh grade and did not obtain a GED. (Tr. at 26). Claimant can read and write, but has trouble doing even simple mathematics. (*Id.*). In the fifteen years prior to Claimant's alleged onset of disability, she worked in janitorial/housekeeping services. (Tr. at 133).

III.  **Relevant Evidence**

The Court has reviewed the Transcript of Proceedings in its entirety, including

the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute. As a preface to the discussion, the Court notes that a substantial number of medical records included in the Transcript of Proceedings pre-date Claimant's alleged onset of disability and, thus, do not directly bear on whether she was disabled during the relevant time period; however, the Court has reviewed those records and will comment on them as necessary to elucidate Claimant's medical background.

### A.     Relevant Treatment Records—Pre-onset of Disability

In November 2000, Claimant began treatment with Rodney Thompson, D.C., at the Thompson Chiropractic Clinic and continued to receive episodic chiropractic care from him through the disability onset date. (Tr. at 288-326).  The records indicate that Claimant initiated care for complaints of lower back pain that radiated into her legs. (Tr. at 318). In addition to receiving chiropractic adjustments, Claimant reported using ice and wearing a lumbar support to reduce her discomfort. (Tr. at 324). Her symptoms waxed and waned over the next two years. (Tr. at 314-320). She described feeling numbness and tingling in her legs, popping in her hips, cervical spasms, and tightness in her low back. (Tr. at 317-320). In September 2002, she developed a severe migraine headache, which prompted her to seek treatment through the Emergency Department at Cabell Huntington Hospital. (Tr. at 311).

On March 24, 2003, Dr. Thompson reviewed x-rays of Claimant's lumbar spine that were taken at St. Mary's Medical Center. (Tr. at 309). The x-rays revealed asymmetry of the facets at L5-S1 with mild degenerative disc disease in the lower spine. In July 2003, Claimant began to complain of right knee and foot pain, but by August, Dr. Thompson felt Claimant's knee was improving with treatment. Claimant continued

to complain of pain and tenderness in her lumbar, cervical and thoracic spine.

On July 1, 2005, Claimant reported to Dr. Thompson that on June 28, 2005, she experienced the onset of a severe headache, which was accompanied by cervical muscle spasms. She sought treatment at the Emergency Department and was diagnosed as having a migraine headache. (Tr. at 295). Dr. Thompson examined Claimant and found right cervical focal tenderness and bilateral muscle spasms. He diagnosed cervical torticollis,[1] cerviocogenic headache,[2] thoracalgia,[3] and thoracic fixation. (*Id.*). After several months of more intensive chiropractic treatment, Claimant noted some improvement. (Tr. at 288).

### B.  Relevant Treatment Records—Post-onset of Disability

On February 27, 2006, Claimant advised Dr. Thompson that she had been horseback riding at home two days earlier and now felt lumbosacral and gluteal pain and tenderness. (Tr. at 287). Dr. Thompson found Claimant to have a decreased range of motion and diagnosed cervico-thoracic and lumbosacral strain/sprain. He treated her with chiropractic adjustments.

On April 26, 2006, Claimant consulted with Diane Mothersbaugh, a certified family nurse practitioner at Valley Health Systems in Wayne. (Tr. at 202). Claimant reported feeling "great" and having a good activity level. Claimant's blood pressure was measured at 110/76, and Nurse Mothersbaugh noted that Claimant's hypertension was controlled. At a follow-up visit on July 19, 2006, Claimant stated that she felt good.

---

[1]  An abnormal condition in which the head is inclined to one side as a result of muscle contractions on that side of the neck. Also called "wry neck." *Mosby's Medical Dictionary*, 8th Edition. © 2009, Elsevier.

[2] In chiropractic, a condition in which headaches are the result of cervical subluxations. *Mosby's Medical Dictionary,* 8th Edition. © 2009, Elsevier.

[3] Pain in the chest. *Dorland's Medical Dictionary for Health Consumers.* © 2007 by Saunders, an imprint of Elsevier, Inc.

Nurse Mothersbaugh assessed Claimant to be stable and instructed her to return in four months.  (Tr. at 235).

Claimant returned to Valley Health on October 25, 2006 for her regular follow-up.  (Tr. at 237). She once again stated that she felt good. Claimant had been taking Crestor for hyperlipidemia and reported having no side effects. Her blood pressure was measured at 128/70; her lungs were clear; and her heart had regular rhythm and rate. On examination, Nurse Mothersbaugh palpated a mass in Claimant's left mid to upper abdomen. The attending physician, Dr. Hurt, also noted the mass on re-examination, describing it as a moveable, softball-sized mass. Nurse Mothersbaugh ordered a CT scan of Claimant's abdomen and pelvis and laboratory profiles of her liver function and lipids. (*Id.*). The laboratory profiles were within normal limits. (Tr. at 245). The CT scan was interpreted to show a large cystic mass believed to be of the right ovary. The radiologist's impression was "cystic neoplasm[4] of the right ovary is suspected." (Tr. at 246). The scan also showed probable uterine fibroids.

On November 13, 2006, Claimant presented to the office of Dr. Gerard Oakley, a gynecologic oncologist practicing at Cabell Huntington Hospital, for further evaluation of the pelvis mass. (Tr. at 377-379). Claimant supplied a medical history of hypertension, hypercholesterolemia, and one normal pregnancy resulting in a spontaneous vaginal delivery. Claimant admitted to smoking half a pack of cigarettes per day for twenty years, but denied alcohol intake.  She reported a normal diet and regular daily activities.  Her medications included Crestor for hyperlipidemia; Vistaril as needed for allergies; and Amiodipine Besylate for treatment of hypertension.  Dr. Oakley

---

[4]  A malignant neoplasm containing closed cavities or saclike spaces. *Mosby's Medical Dictionary,* 8th Edition. © 2009, Elsevier.

interviewed Claimant, reviewing all of her systems to elicit concerns or complaints. She denied any problems, except for back pain in the recent past. She told Dr. Oakley that she currently had no arthritis, bone pain, joint pain, muscle weakness or decreased range of motion. Upon performing a complete physical examination, Dr. Oakley documented no abnormalities other than the presence of the pelvic mass. His examination of Claimant's back and spine was negative for reduced range of motion or muscle compromise and revealed no unusual objective findings. (*Id.*). Dr. Oakley recommended an exploratory laparotomy, total abdominal hysterectomy, and a bilateral salpingo-oophorectomy for removal and diagnosis of the mass. (*Id.*).

Claimant underwent the recommended surgery on November 30, 2006. (Tr. at 374-76). There were no complications during the procedure, and Claimant was discharged the following day. (Tr. at 387). The mass was sent for pathological examination and was diagnosed as an atypical proliferative (borderline) serous tumor[5] without evidence of invasion. (Tr. at 360-62).

On December 13, 2006, Claimant returned to Nurse Mothersbaugh for an evaluation. (Tr. at 234). She reported having aches when taking Crestor, so the medication was discontinued. Nurse Mothersbaugh ordered a hepatic panel and provided Claimant with samples of Welchol, another cholesterol-reducing medication. The results of the hepatic panel were within normal limits. (Tr. at 243). Nurse Mothersbaugh checked Claimant again on January 3, 2007 to determine if she had any side effects from Welchol. (Tr. at 233). Claimant stated that Wechol made her dizzy, so Nurse Mothersbaugh told Claimant not to take it anymore and switched her to Zetia.

---

[5] Borderline ovarian tumors are a subset of ovarian carcinomas that are generally noninvasive and have a superior prognosis when compared to other ovarian cancers. Stage I serous borderline tumors have a 99.5% survival rate and are called "atypical proliferative serous tumors" to convey their benign nature. *Ovarian Cancer,* Johns Hopkins Pathology. © 2000-2012 Johns Hopkins University.

Claimant reported on January 31, 2007 that she had no side effects from Zetia and felt good. (Tr. at 233). Nurse Mothersbaugh performed a focused examination and concluded that Claimant's chronic conditions were "stable." (*Id.*).

Claimant returned to Dr. Oakley's office on January 15, 2007. (Tr. at 370). She stated that she was doing well with only occasional right lower quadrant pain when she was rolling over or lifting. (Tr. at 370-71). On examination, Dr. Oakley found no abnormalities. He documented that Claimant was doing well and could increase her activities, including a return to horseback riding.

On February 28, 2007, Claimant returned to Dr. Thompson's office complaining that her thoracic spine felt "locked up," and she had "pain in the neck constantly with headaches from the neck" and "numbness in both arms at night." (Tr. at 281). She reported having been in two motor vehicle accidents since her last chiropractic visit a year earlier. The first accident happened when she hit a patch of ice and went into a ditch. She did not hurt herself and received no medical attention. The second accident occurred in the Spring of 2006. The tire came off of her car causing the vehicle to flip over. She did not seek medical attention, although she thought that she broke a rib. She finally came to see Dr. Thompson because she was sitting on the couch and could not get up. Dr. Thompson examined Claimant and noted that she could stand unassisted and use her arms; she had no assistive devices. However, she had lumbar spasms with paraspinal tenderness, right forward antalgia,[6] and decreased flexion and extension of her lumbar spine. (Tr. at 282). Dr. Thompson ordered x-rays of the pelvis and the lumbar, thoracic and cervical spine, which he reviewed with Claimant on March 1, 2007.

---

[6] Counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain. *Dorland's Medical Dictionary for Health Consumers.* © 2007 by Saunders, an imprint of Elsevier, Inc.

(Tr, at 280).  According to Dr. Thompson, the x-rays showed that Claimant's cervical spine had spondylosis[7] with disc space narrowing and encroachment of the C5-C6 level; the lumbar spine had spondylosis, osteophyte formation and asymmetry of the articular facets at L5; and the thoracic spine had mild spondylosis. Dr. Thompson performed adjustments of the entire spine.

Claimant returned to Dr. Thompson frequently during the months of March and April 2007 for adjustments. (Tr. at 277-280). Her range of motion improved and her pain decreased, although certain activities, such as running the vacuum, exacerbated her pain. Also during the month of March, Claimant saw Dr. Oakley for a follow-up evaluation. (Tr. at 392-93). Claimant complained of having menopausal symptoms secondary to her hysterectomy and was prescribed hormone replacement therapy.

On April 11, 2007, Claimant had her regular follow-up appointment with Nurse Mothersbaugh. (Tr. at 232). Nurse Mothersbaugh performed a focused examination and concluded that Claimant's chronic conditions were stable on the current medication regimen. She instructed Claimant to return in six months.  (*Id.*).

On July 18, 2007, Claimant returned to see Dr. Oakley. (Tr. at 363-367). She denied having any menopausal symptoms and asked to have her dosage of hormone replacement decreased to lessen the potential of side effects. On examination, Dr. Oakley found no abnormalities. Claimant denied having any psychiatric symptoms and made no complaints of pain in her back, spine, or extremities.  (*Id.*).

Claimant reinitiated chiropractic care on August 13, 2007. (Tr. at 274). She complained of having some lumbosacral pain and tenderness that had become acute and

---

[7] Degenerative spinal changes due to osteoarthritis. *Dorland's Medical Dictionary for Health Consumers.* © 2007 by Saunders, an imprint of Elsevier, Inc.

radiated into her right lower extremity.  Her range of motion was decreased and she had a forward antalgia. Claimant's cervical spine was also noted to be tender with a decreased range of motion, spasms and fixation. Her thoracic spine showed spasms, and a sacral iliac test was positive. Dr. Thompson performed adjustments and advised Claimant to return when the pain was acute. (*Id.*). Claimant returned four times in August and three times in September.  (Tr. at 271-74).

On October 13, 2007, Claimant returned to Valley Health Systems and was seen by Larissa Pitts, certified family nurse practitioner. (Tr. at 341). Claimant stated that she was having anxiety attacks and had been on an anti-depressant for approximately one week, but it did not relieve her symptoms. Nurse Pitts examined Claimant and found no objective abnormalities. She noted that Claimant's hypertension and lipids were stable and controlled on medication. Nurse Pitts gave Claimant a prescription for Vistaril to treat anxiety and a receipt to seek evaluation at Prestera Centers for Mental Health ("Prestera"). She instructed Claimant to return to Valley Health Systems in six months. (*Id.*).

Claimant next saw Dr. Thompson on January 8, 2008 complaining of pain and tenderness to the right sacral spine. (Tr. at 270). He performed an adjustment and instructed Claimant to return when the pain was acute. She returned six times in January, four times in February, and three times in March. (Tr. at 266-70). On each occasion, Claimant was given a spinal adjustment and told to return when her pain was acute.

On March 10, 2008, Claimant presented to Valley Health Systems for her regular appointment and was seen by Daniel Whitmore, D.O. (Tr. at 331). She voiced no complaints or concerns.  Dr. Whitmore changed Claimant's medications to pravastatin

to treat her high cholesterol, lisinopril and diltiazem for her hypertension. He ordered screening laboratory tests, which revealed elevated cholesterol. Dr. Whitmore increased Claimant's prescription of pravastatin.  (Tr. at 332).

On April 2, 2008, Claimant initiated care at Prestera. (Tr. at 411-34). She reported severe behavior withdrawal; moderate paranoia; moderate depression; severe anxiety and pain; and severe loss of interest in activities. (Tr. at 412-23). She admitted to having depression for fifteen years with a 1994 admission to the behavioral health unit at St. Mary's Medical Center, but denied crisis intervention or substance abuse counseling. (Tr. at 414, 417). A complete psychiatric history was provided by Claimant to Hewlitt Trogdon, a clinician at Prestera. (Tr. at 422-26). Claimant's primary complaint was panic attacks, which had waxed and waned in the preceding four years. She indicated that she avoided contact with others and had stopped many of her regular activities, because she would explode at people and felt others were talking about her. (Tr. at 427).  She had a dysfunctional childhood and a history of long-term abuse by a former boyfriend, who was the father of her child. She reported having a hysterectomy, hypertension, and high cholesterol. She claimed to get along well with her husband, daughter, and stepdaughter, although she periodically yelled at them for no good reason. (Tr. at 422-26). A mental status examination revealed that Claimant was oriented x 4; her speech and appearance were normal; she had some flights of idea and was socially isolated; her attention span was good; her thought content was paranoid; her memory was good and intelligence was average; her insight was poor and her judgment was fair; and she had no suicidal or homicidal ideations. (Tr. at 416, 433-34). Mr. Trogdon's provisional diagnosis was Social Phobia and Depressive Disorder, not otherwise specified ("NOS"). He referred Claimant to a Prestera psychiatrist, Dr.

Razapour for medication management and planned to work with Claimant on developing coping skills. (Tr. at 246).

On April 16, 2008, Claimant had her first counseling session with Mr. Trogdon. (Tr. at 429-30). She complained of having five panic attacks in the prior two weeks. She related having self-esteem issues. Mr. Trogdon discussed coping strategies with Claimant. He documented that Claimant was scheduled to see Dr. Razapour immediately after her counseling session. When Claimant presented, Dr. Razapour completed an initial psychiatric evaluation. (Tr. at 431-32). Claimant told Dr. Razapour that her anxiety attacks began approximately five years earlier and had worsened to the point that she could not be in public without feeling chest pain and shortness of breath. She described having poor sleep, feeling nervous, and having poor self-esteem. Her medical history included chronic back pain, hypertension, and high cholesterol. Dr. Razapour noted that Claimant's grooming was good; she was cooperative; and had no delusions. Her thought process was goal-directed and her sensorium, memory, and concentration were all intact. Dr. Razapour diagnosed Claimant with Major Depressive Disorder, recurrent, moderate and Panic Disorder with agoraphobia. She decided to try Claimant on a prescription of Lexapro, Triazodone, and Klonopin. Dr. Razapour instructed Claimant to continue with individual therapy and return in four weeks. (*Id.*).

Claimant's next individual counseling session was on May 5, 2008. (Tr. at 435-36). Claimant described some success with the techniques she had learned to identify the warning signs of an impending panic attack and avoid it. She continued to report good family support. Claimant felt the medication was helping her and stated that she was doing better and thought she was progressing toward getting her panic attacks under control. (*Id.*). She repeated these feelings to Dr. Razapour on May 19, 2008,

although Claimant did complain that Lexapro gave her a headache. (Tr. at 438). Dr. Razapour discontinued Lexapro and prescribed Cymbalta.  She scored Claimant's Global Assessment of Functioning ("GAF") at 60.[8]

Claimant next saw Dr. Razapour on July 14, 2008.  (Tr. at 442).  Claimant stated that she was doing fine and sleeping and eating well. She reported no side effects from her medication. Dr. Razapour found no major changes in Claimant's mental status evaluation and decided to keep her on the same medications. Dr. Razapour assessed Claimant's GAF score as 65.[9]

The final record in evidence was prepared by Dr. Thompson on November 30, 2008. (Tr. at 443-445). Dr. Thompson completed a Medical Assessment of Ability To Do Work-Related Activities (Physical) Form, opining that Claimant had arthritis of the spine, disc narrowing, and pinched nerves in the back and neck, which prevented her from lifting and carrying five pounds or more. According to Dr. Thompson, Claimant could stand 1 hour during an eight hour workday and no more than 15 minutes uninterrupted. She could sit only thirty minutes at a time without taking a break and could never climb, balance, stoop, crouch, kneel, or crawl. (*Id.*). He felt that Claimant's muscle spasms limited her ability to reach, bend, and push or pull, and she needed to avoid heights, moving machinery, and vibrations.  (*Id.*).

---

[8] The GAF scale is a tool for rating a person's overall psychological functioning on a scale of 0-100.  This rating tool is regularly used by mental health professionals and is recognized by the American Psychiatric Association in its *Diagnostic and Statistical Manual of Mental Disorders (DSM) IV.*  A GAF of 60, which falls in the range of 51-60, indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).

[9] A GAF score between 61-70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

## C.    Agency Assessments

On January 24, 2007, Dr. W. Roy Stauffer performed an internal medicine examination of Claimant at the request of West Virginia's Disability Determination Service ("DDS"). (Tr. at 213-218). Claimant provided a subjective history of back and hip pain that began approximately seven years earlier, was chronic, and radiated into both lower extremities with associated numbness. She also described bilateral shoulder pain and cervical arthritis. She denied having surgery or injections and took Tylenol for pain relief, although it did not help. She stated that her pain limited her ability to lift, bend, stand more than 15 minutes, raise her arms or use her neck. Claimant reported having hypertension and high cholesterol and indicated that she had a uterine mass, which had been removed by hysterectomy. Claimant did not mention having any psychiatric symptoms. Dr. Stauffer completed a thorough physical examination. He found tenderness of Claimant's back and knee with decreased bilateral shoulder flexion, decreased lumbar flexion, and decreased cervical extension and rotation. Claimant was able to squat, although she was slow in rising. She had leg pain when walking on her heels and toes. Claimant's mental status examination was normal, and she was neurologically intact with normal motor strength, fine and gross manipulation, deep tendon reflexes, and sensation. Dr. Stauffer diagnosed Claimant with chronic low back pain secondary to degenerative joint disease, muscle spasm, and possible scoliosis; bilateral shoulder pain most likely related to degenerative joint disease of the neck and shoulders; and controlled hypertension. (Tr. at 215). Taking into account, Claimant's limitations in range of motion and her complaints of pain, Dr. Stauffer opined that Claimant could lift fifty pounds occasionally and twenty-five pounds frequently; she could stand, walk, or sit six hours, each, in an eight hour work day; and had unlimited

ability to push or pull. Dr. Stauffer felt Claimant would have some difficulty climbing ladders, ropes or scaffolds, but he did not believe she had any manipulative limitations other than repetitive reaching overhead.  (Tr. at 215-16).

Mandy Rebrook, a single decision maker, completed a Physical Residual Functional Capacity Assessment Form on February 5, 2007. (Tr. at 219-226). Her assessment of Claimant's exertional limitations mirrored those of Dr. Stauffer. She did not feel Claimant had any postural, manipulative, visual, communicative, or environmental restrictions. She did not feel Claimant was fully credible because the medical records did not support the severity of the limitations described by Claimant. (*Id.*).

A second Physical Residual Functional Capacity Assessment Form was completed by Dr. A. Rafael Gomez on August 3, 2007.  (Tr. at 257-264).  Dr. Gomez concluded that Claimant had no severe impairments. He indicated that Claimant was less than credible, because her allegations were not supported by the medical evidence.  He opined that she had no exertional or other limitations.  (*Id.*).

## IV.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any

step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy.

*McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. §§ 404.1520a, 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's mental residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this particular case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31,

2010. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset date of January 26, 2006.  (Tr. at 12, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant had the severe impairments of: degenerative disc disease of the lumbar spine; depression and anxiety with social phobia; and bilateral shoulder degenerative disc disease. (Tr. at 12, Finding No. 3).  The ALJ took note of Claimant's history of ovarian mass and subsequent surgery, but found that this condition was non-severe as Claimant had no current symptoms or complaints. The ALJ further determined that Claimant's bronchitis and hypertension were not severe impairments because Claimant had no medical diagnosis of bronchitis and her hypertension was controlled by medication. Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the impairments contained in the Listing. (Tr. at 13-14, Finding No. 4). Accordingly, the ALJ assessed Claimant's residual functional capacity (hereinafter "RFC") as the following:

> [M]edium work as defined in 20 CFR 404.1567(c) and 416.967(c), with limitations as described the function by function discussion below.

(Tr. at 15, Finding No. 5).

In the function-by-function discussion, the ALJ found that Claimant could not climb scaffolds, ladders, or ropes and could not balance, stoop, kneel, crouch, or crawl. The ALJ acknowledged Claimant's psychiatric impairment, but concluded that this condition did not significantly interfere with her ability to understand, remember, and carry out instructions; use judgment; respond appropriately to occasional contact with supervisors and co-workers; or adjust to changes in the routine work setting. Relying on

the testimony of a vocational expert, the ALJ determined that Claimant could return to her past relevant employment as an office cleaner, uniform laundress, and kitchen worker. (Tr. at 18, Finding No. 6). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 19).

## V.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.   In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence.   Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001).  If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision."   *Blalock v. Richardson, supra* at 775*.*

A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## VI.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant argues that the Commissioner's decision should be reversed and/or remanded for the following reasons:

1.     The ALJ disregarded the effects of Claimant's back pain and anxiety/depression.

2.     The ALJ failed to properly assess Claimant's credibility and pain;

3.     The ALJ failed to consider Claimant's impairments in combination;

4.     The ALJ improperly disregarded Dr. Thompson's RFC assessment;

5.     The ALJ failed to fully develop the record; and

6.     The ALJ failed to rebut the presumption of disability.

(Docket No. 14). The Commissioner responds that the ALJ more than accommodated Claimant's alleged impairments and still found Claimant capable of performing her past relevant work; therefore, the decision of the Commissioner should be affirmed.  (Docket No. 15).

Having thoroughly scrutinized the record and the arguments of counsel, the Court finds that the challenges raised by Claimant are unpersuasive and the decision of the Commissioner is supported by substantial evidence.

## VII.   <u>Analysis</u>

### A.     **Effects of Claimant's Pain and Psychiatric Impairments**

Claimant first argues that the ALJ disregarded the effects of her severe chronic back pain and psychiatric impairments. (Docket No. 14 at 5-6).  According to Claimant, the records substantiate her repeated complaints of pain and her efforts to find pain

relief. Moreover, Claimant argues that the pain had a deleterious effect on her ability to concentrate and maintain persistence and pace.

Contrary to Claimant's allegations, the ALJ clearly considered the effects of Claimant's pain and psychiatric symptoms in rendering a decision. (Tr. at 14-18). The ALJ reviewed Claimant's multiple musculoskeletal complaints to Dr. Thompson, noting that Claimant did not make similar complaints to her primary care physicians. Claimant treated with Dr. Thompson only when she had acute symptoms and generally discontinued treatment and resumed her normal daily activities when she improved. Her statements to Dr. Thompson also conveyed an active lifestyle and indicated that her back and neck "flare-ups" were often connected to a specific traumatic event. For example, she saw Dr. Thompson for treatment of acute pain after riding her horse and after having been involved in two motor vehicle accidents. Although the second accident resulted in her car flipping over, Claimant did not immediately seek treatment from Dr. Thompson. When she finally did seek treatment, she went to Dr. Thompson for a few months and then discontinued seeing him. When she subsequently returned for chiropractic care, several months later and after a new onset of pain, Dr. Thompson's records showed only mild to moderate pain and tenderness. (*Id.*).

The ALJ additionally noted that Claimant initiated psychiatric care in April 2008 complaining of panic attacks. However, by May, Claimant had improved with counseling and medication. (*Id.*). By June, she had progressed even further in controlling her panic attacks and stated she had more positive days than negative ones. In her July visit with Dr. Razapour, Claimant reported that she was sleeping well and had no side effects from her medications. Her GAF score was a 65, which indicated the presence of only mild symptoms.

Certainly, a large part of the ALJ's discussion of the effects of Claimant's impairments is contained in the ALJ's credibility analysis. As discussed *infra*, the ALJ found Claimant's descriptions of the intensity, severity, and persistence of her symptoms to be exaggerated, because they conflicted with other credible evidence. The ALJ observed that Claimant's statements to her treating health care professionals did not convey the severity of symptoms described by Claimant at the administrative hearing. Similarly, Claimant's sporadic chiropractic treatment and rapid improvement with mental health counseling belied her testimony regarding the intensity and persistence of her impairments. (Tr. at 18). In the course of making these comparisons, the ALJ undoubtedly considered the effects of Claimant's alleged impairments on her ability to engage in substantial gainful employment. Therefore, the Court finds no legitimate basis to support this challenge.

### B.    Claimant's Pain and Credibility

As a corollary to Claimant's preceding argument, she contends that the ALJ erred in finding her less than credible when describing the persistence, intensity, and limitations associated with her symptoms. (Docket No. 14 at 6-7). She asserts that the ALJ "disregarded the medical records," adding "[i]t is unreasonable to believe that [Claimant] would have the quantity of medical records and the ability to repeatedly exaggerate the severity and duration of her symptoms for years on end, and dupe numerous medical providers." (*Id.* at 7). Obviously, Claimant has misunderstood or overlooked the ALJ's rationale underlying the credibility determination. Indeed, the ALJ relied heavily upon the medical records; in particular, Claimant's statements made to health care providers during the course of her treatment and the objective medical findings.

Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, to determine their limiting effects on a claimant. *See, also* 20 C.F.R. §§ 404.1529, 416.929.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms.  SSR 96-7P.  Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in the case record. *Id.*

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not simply replace its own *de novo* credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *See Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-

990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security Ruling and was supported by substantial evidence. 20 C.F.R. § 404.1529; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Considerable evidence existed in the record that Claimant's testimony regarding pain and psychological distress did not correlate with her reported level of activity, her functional abilities as assessed by the agency consultants, and the objective medical records.

As stated in the written decision, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but her statements concerning their intensity, persistence, and limiting effects were not entirely credible when considering the evidence in its totality.  On the issue of Claimant's musculoskeletal problems, the ALJ pointed out that Claimant made no complaints to her primary care physicians regarding back, shoulder, or neck pain. (Tr. at 18). She worked for six years after the onset of her back pain, receiving chiropractic care sporadically, on an "as needed" basis. She never had surgery on her back or neck and had not received injections or been prescribed assistive devices. Claimant testified that her pain was constant and debilitating, yet she took only Tylenol for relief. Although Claimant testified that she had to give up her hobbies, the records indicate that she continued horseback riding well after the alleged disability onset date; in fact, she specifically received permission from Dr. Oakley in January 2007 to resume riding after her hysterectomy. (Tr. at 370-71). By March 2008, Dr. Thompson's records confirm that Claimant had only mild to moderate symptoms and she reported "doing better," with fewer acute episodes, decreased spasms, and increased range of motion.

(Tr. at 266). Similarly, during her April 2008 visit with her family physician, Claimant expressed no complaints or concerns.  (Tr. at 330).  Moreover, Claimant's descriptions of her psychiatric distress did not correspond with her statements to the mental health providers or their objective findings. Claimant testified that she had severe panic attacks with migraine headaches that prevented her from going out in public and interfered with her sleep. Yet, in a June 2008 counseling session, only two months after Claimant initiated psychiatric treatment, her therapist noted that Claimant was finding advanced ways to deal with her panic attacks and anxiety and was "making huge steps in what she is able to do." (Tr. at 437). Claimant conceded that she now had more positive days than negative ones. At her July 2008 appointment with Dr. Razapour, Claimant reported that she was doing fine, sleeping well, and eating normally. (Tr. at 442). She had voluntarily discontinued the medications prescribed to treat her anxiety and insomnia and denied having headaches. Dr. Razapour documented that Claimant had an improved GAF score and agreed with Claimant's decision to limit her medication regimen to a single antidepressant, Cymbalta. (*Id.*).

Having scrutinized the ALJ's decision and the evidence in its totality, the Court finds that the ALJ thoroughly considered Claimant's complaints of pain and psychological distress, conducted a reasoned review of the evidence, and adequately explained the grounds underlying her credibility determination. Consequently, the ALJ's ultimate finding on this issue has substantial evidentiary support.

### C.     Impairments in Combination

Claimant next argues that the ALJ failed to consider Claimant's impairments in combination, including her severe back pain and anxiety/depression. (Docket No. 14 at 7-8). Claimant recites the applicable Social Security regulations and case law, but fails to

provide any factual basis for her challenge. Undoubtedly, the ALJ was required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). The relevant regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the Fourth Circuit Court of Appeals stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker v. Bowen, supra* at 50.

In this case, the ALJ fulfilled her obligation to evaluate Claimant's impairments, separately and in combination. As noted in the preceding section, the ALJ explicitly

analyzed Claimant complaints of pain, her treatment history, and the severity of her anxiety and depression using the paragraph B criteria. Moreover, when constructing the boundaries of Claimant's RFC, the ALJ clearly considered the combined impact of Claimant's musculoskeletal and psychological impairments on her ability to perform basic work activities. The ALJ identified an exertional level that best suited Claimant's maximum capability and refined it by conducting a function-by-function analysis, resulting in an RFC determination that incorporated Claimant's individual postural and psychological restrictions. (Tr. at 14). To the extent that the ALJ did not elaborate further on her analysis of Claimant's impairments in combination, the Court finds this to be harmless error.[10]

 The ALJ unequivocally considered Claimant's impairments in combination. During the administrative hearing, the ALJ posed several hypothetical questions, each of which built upon the last by adding to the combination of impairments. The ALJ asked the vocational expert if a hypothetical individual of Claimant's age, education level, past relevant work, and RFC could perform her past relevant work.  (Tr. at 46-47). After receiving an affirmative answer, the ALJ added a repetitive reaching restriction,

_____

[10] Courts have applied a harmless error analysis in the context of Social Security appeals.  One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir.1988).  The procedural improprieties alleged by [claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

*Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *See, also, Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach. *See, e.g., Bishop v. Barnhart*, No. 03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

and then added a climbing restriction. The vocational expert indicated that these added restrictions did not affect Claimant's ability to perform her prior employment duties. The ALJ went further and added pulmonary restrictions, which eliminated only those jobs performed in the kitchen. The ALJ added a sit/stand option, which did remove Claimant's past relevant work, but did not eliminate other light and sedentary jobs that existed in significant numbers in the national and regional economy; such as, salad maker, assembler, hand packer, mail addresser, and bench worker. (Tr. at 47-48).

The ALJ's decision contains numerous specific references to the evidence upon which she relied and the written decision makes clear that she considered the synergistic effects of Claimant's symptoms. The ALJ's discussion at each step of the sequential evaluation is sufficient for the Court to determine whether the Commissioner's final decision was supported by substantial evidence. Therefore, the Court finds that any shortcomings in the ALJ's discussion of the combined effects of Claimant's impairments do not warrant remand.

### D.    Consideration of Dr. Thompson's RFC Opinion

Claimant contends that the ALJ improperly disregarded the opinion of Dr. Thompson, Claimant's "treating physician." (Docket No. 14 at 8-9). In particular, on November 30, 2008, Dr. Thompson completed a Medical Assessment of Ability To Do Work-Related Activities (Physical) Form, opining that Claimant had arthritis of the spine, disc narrowing, and pinched nerves in the back and neck, which prevented her from lifting and carrying five pounds or more and from sitting or standing more than 30 minutes to an hour without a break. (Tr. at 443-445). In addition, Dr. Thompson opined that Claimant was severely limited in her ability to reach, bend, push, and pull and could never climb, balance, stoop, crouch, kneel, or crawl. (*Id.*). The ALJ gave Dr. Thompson's

opinions "limited weight" because his own records and x-ray interpretations did not "justify the severity of the limitations imposed and [were] not credible." (Tr. at 17).

20 C.F.R. §§ 404.1527(d), 416.927(d) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. An "accepted medical source" is defined in the regulations to include a licensed physician; licensed or certified psychologist; licensed optometrist for eye disorders; licensed podiatrist for foot disorders. Opinions of "other sources" are considered differently than opinions of accepted medical sources. The term "other sources" refers to individuals such as nurse practitioners, chiropractors, physicians' assistants, naturopaths, audiologists, and therapists; educational personnel; social welfare personnel; and other non-medical sources like relatives, friends, clergy, caregivers, and neighbors. 20 C.F.R. §§ 404.1513(d), 416.913(d). Consequently, Dr. Thompson, as a chiropractor, is not an "accepted medical source," but is an "other source" under the regulations, and his opinions are treated accordingly.

Generally, in the hierarchy of opinions, the Social Security Administration will give more weight to the opinion of an examining medical source than to the opinion of a non-examining medical source. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). In contrast, the opinions of "other sources" are not considered in establishing the existence of a medically determinable impairment, but may be considered by the ALJ in determining the severity of a claimant's impairments and their effect on the claimant's ability to work. Other source opinions are never entitled to controlling weight. (*Id.*).

With this legal framework in mind, the Court reviewed the ALJ's handling of Dr. Thompson's opinion. The ALJ reviewed Dr. Thompson's RFC assessment and compared his opinion to his own treatment records. She noted that Dr. Thompson felt Claimant could not lift even five pounds; could not stand or sit more than thirty minutes at a time; and could not climb, balance, stoop, kneel, crouch, or crawl.  The ALJ emphasized that, in contrast, Dr. Thompson's records revealed that Claimant reported only mild to moderate symptoms when she visited his office for care. Further, an x-ray ordered by Dr. Thompson showed degenerative changes with disc space narrowing, but did not contain findings generally present with disabling pain. The ALJ concluded that Dr. Thompson's opinion could not be reconciled with his records and objective findings; therefore, she gave it limited weight. (Tr. at 17). The ALJ's decision to discount Dr. Thompson's opinion complied with the applicable Social Security regulations. She had no obligation to give Dr. Thompson's opinion controlling weight and properly considered its reliability in determining the severity of Claimant's symptoms. When she chose to reject Dr. Thompson's RFC assessment, the ALJ explained her rationale for doing so.

Having considered the evidence of record, the Court finds that the ALJ's rationale was supported by substantial evidence. Claimant made no complaints of severe back, shoulder or neck pain to her treating physicians. She used only ice and over-the-counter medications to treat her pain and saw Dr. Thompson on an "as needed" basis.  She never consulted with or was referred to a specialist, such as a neurologist, neurosurgeon, or orthopedist, and had not been prescribed injections or assistive devices. Although she walked with a cane at the administrative hearing, she did not use a cane at the time of her DDS evaluation by Dr. Stauffer and was not noted to have a cane in the office

records memorializing her visits with Dr. Thompson, Valley Health Systems, and Prestera. On March 10, 2008, Claimant initiated care with a new primary care provider, but made no complaints of pain in her neck, shoulders, back or knees.  (Tr. at 331). When considering the lack of *medical* treatment received by Claimant, her physically demanding hobby of horseback riding, and her ability to sustain two motor vehicle accidents—at least one of which involved her car flipping over— without the need for immediate care, the ALJ's rejection of Dr. Thompson's remarkably severe restrictions is indisputably reasonable.

### E.      Duty to Develop the Record

Claimant next argues that the ALJ failed to accurately develop the record, stating "the Administrative Law Judge has the duty to explore all relevant facts and inquire into issues necessary for an adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." (Docket No. 14 at 9). Other than reciting this legal standard, Claimant provides no basis to discern its applicability to the present case.

Here, the ALJ's duty was to insure that the record contained sufficient evidence upon which she could make an informed decision.  *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *See also*, *Weise v. Astrue,* 2009 WL 3248086 (S.D.W.Va.). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the Court looked for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant.  *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980). The Court found none. Claimant applied for disability benefits based upon "lower back and shoulder problems and a uterine mass" and subsequently added depression and panic attacks. (Tr. at 132). The ALJ had

comprehensive treatment records regarding these conditions from all of the health care providers identified by Claimant, as well as a thorough agency-procured physical examination by an internist and multiple RFC assessments by other agency consultants. In addition to this evidence, the ALJ and Claimant's counsel meticulously questioned Claimant regarding her daily activities, limitations, alleged pain, anxiety and depression during the administrative hearing. (Tr. at 27-44).  Consequently, the Court finds no evidentiary gaps in the record and, thus, no merit to Claimant's contention that the ALJ failed to fulfill her duty to develop the record.

### F.    Presumption of Disability

Claimant's final contention is that the ALJ did not carry her burden to produce evidence sufficient to rebut the "presumption of disability." (Docket No. 14 at 9-10). The Court finds this contention to be equally without merit. Claimant is ultimately responsible for proving that she is disabled, and that responsibility never shifts to the Commissioner. While the Commissioner may have a duty to go forward with the evidence at the fourth step of the evaluation, Claimant nonetheless retains "the risk of non-persuasion." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056 (4th Cir. 1976).

The SSA recognizes at the fourth step of the sequential disability evaluation that when a claimant proves the existence of severe impairments that prevent the performance of past relevant work, the claimant has established a *prima facie* case of disability. The burden of production then shifts to the Commissioner to provide evidence demonstrating that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  20 C.F.R. §§404.1520(g); *See also, McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner

must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 404.1569. However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform. *Id.* For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* In those cases, the ALJ must prove the availability of jobs through the testimony of a vocational expert. *Id.* As a corollary to this requirement, however, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant so long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. *See Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

In the present case, Claimant never progressed to the fifth and final step of the process, because the ALJ determined, with the assistance of a vocational expert, that

Claimant was capable of performing her past relevant employment as an office cleaner, uniform laundress, and kitchen worker, both as she actually performed these jobs and as they are generally performed. Hence, Claimant failed to establish a *prima facie* case of disability that would have shifted the burden of going forward with the evidence to the Commissioner. As such, the Commissioner had no duty to rebut a non-existent "presumption." Accordingly, this challenge lacks both a factual and legal foundation.

## VIII.   <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  February 3, 2012.

Cheryl A.  Eifert
United States Magistrate Judge

- 33 -